# CASES

### DECIDED IN THE

# SUPREME COURT OF APPEALS

## OF WEST VIRGINIA.

---

## CHARLESTON, JANUARY TERM, 1873.*

---

MATTHEW HARRISON EXECUTOR OF BURR W. HARRISON, DEC'D, PLT'F IN THE ACTION, PLT'F IN ERROR AGAINST THE FARMERS' BANK OF VIRGINIA, DEF'T IN THE ACTION, DEF'T IN ERROR.

### Decided January 27th, 1873.

#### SYLLABUS.

H. Residing in Virginia, draws orders on the 2nd Auditor of the State, for interest due him, in favor of the Cashier of a Bank in Richmond, who collects the amount, and deposits the same to the credit of H, as so much cash or dollars. In an action of assumpsit, the common counts are filed; and the defendant files in addition to the plea of non-assumpsit, a special plea, alleging that said deposits were made in Confederate treasury notes, and that H agreed that the same might be paid and returned to him. HELD:

---

*NOTE.—Judge Hoffman was sick and absent at the hearing of a number of the cases argued at this Term.

1873
Janauary
Term.

Matthew Har-
rison ex'or of
Burr W. Har-
rison, dec'd,
v.
The Farmers'
Bank of Va.

1. That the plea is immaterial, and if issue is joined upon it, and found for the defendants, it may be disregarded.

2. When a jury is waived, and the whole case submitted to the court, and a judgment rendered, to which exception is taken, and the *facts* certified to this court, the Supreme Court will review the case, and if the judgment is found to be clearly against the law and facts, will reverse it.

3. The Bank having filed pleas, introduced evidence, and made its defence, upon subjects other than the absence of demand, and the issue found upon the facts proved, for the Bank, and judgment rendered accordingly, cannot make the objection in an appellate court for the *first time*, that no demand was proved in the court below, no defence having been made there upon that ground, and demand before commencement of suit being averred in the declaration.

*Boggess, Price* and *Dennis*, for Plaintiff.

*Snyder* and *Mathews* and *Mathews*, for Defendant.

PAULL, JUDGE:

This is an action of assumpsit brought by the Plaintiff for the recovery of $2,880, being the amount of deposits made with the Defendants by the Plaintiff's testator: said Defendants being, at the time when said deposits were made, a corporation, doing business in the city of Richmond, Virginia. The ordinary Common Counts for money paid, had and received, &c., constitute the declaration. In addition to the plea of non-assumpsit, the Defendants file two special pleas, one of which is found in a former record of this case, and the other in the record *now* before the Court; the only difference between the two being, that the latter alleges not only that these deposits consisted of the Treasury notes of the Confederate States, but that Burr W. Harrison, (Pl'ff's testator) agreed with the Bank at the time of said deposits, that they should be paid and returned in the same kind of money—both pleas alleging that said notes were an illegal currency. Are these pleas taking them as true, suf-

ficient to bar the Plaintiff's action, is the first question arising upon this record. The first plea alleges no knowledge, even, much less any agreement on the part of Burr W. Harrison, in relation to the character of the deposits, that were in the Bank, and however vicious, or illegal may have been this currency, the plea does not allege that he even knew the fact, or had the slightest connection with it in any manner, or for any purpose whatever: the plea is manifestly immaterial.

The second plea goes farther and alleges that he *agreed* with the Bank, that these treasury notes, so deposited might be paid and returned to him. This plea then raises the question, whether an agreement by an individual made during the late civil war, in the State of Virginia, or in that part of it rather, which was known and recognized at the time as in a state of disloyalty to the General Government, and where the parties were then residing, by which he agreed to receive Confederate treasury notes in discharge of a debt due to himself, will now bar a recovery of that debt in the courts of this State. I think it will not. This identical question was before the Supreme Court of the United States, in the case of Thorington *vs.* Smith 8th Wallace, page 1. In that case a vendor filed his bill in the court below in the State of Alabama, to enforce his lien for the payment of the purchase money for land sold, for which in November, 1864, the defendants had executed their note to the plaintiff for $10,000. The answer of the defendants set up by way of defence, that this contract was made in that portion of the State, where the authority of the United States was excluded, and the only currency in use consisted of Confederate treasury notes, issued by the Confederate Government. On the hearing it was proved that it was agreed and understood that the note should be paid in Confederate States treasury notes. This case coming before the Supreme Court, Chief Justice Chase, delivering the opinion of the Court, said the first question is this, "can a contract for the payment of Confederate notes

1873.
January
Term.

Matthew Harrison ex'or of
Burr W. Harrison, dec'd.
v.
The Farmers'
Bank of Va.

1873.
January
Term.

Matthew Harrison's ex'or of
Burr W. Harrison, dec'd.
v.
The Farmers'
Bank of Virginia.

made during the late rebellion between parties residing within the so called Confederate States, be enforced at all in the courts of the United States." Thus, this question, which has given rise to no little difficulty to the judiciary of this, and some other States, was fairly and fully before the Supreme Court of the country, its highest tribunal established by that government, against which the rebellion was waged, and to aid and sustain which the Confederate treasury notes were issued; and that court has solemnly announced its decision, as to their effect upon the contracts of parties residing at the time they were made, within the insurrectionary territory, and subject to the laws and the power of that government under which they lived. Our peculiar form of government, complex in its character, and embracing the true relations of the States to the National authority, as well as to each other, has from its origin given rise to a variety of questions, some of which have been of the gravest nature, never settled by the Courts, nor satisfactorily decided in the intelligent convictions of many of the wisest and best citizens in all sections of the land. What those questions were, and how their agitation finally led to a civil war unparalleled in its dimensions in history, I need not speak of. It is known to us that the rebellion broke out in the Spring of 1861, and in a very short space of time, established another government over a very large extent of territory, and over twelve millions of people, where for four years the authority and laws of the United States were almost entirely excluded. The people of this government established for themselves a currency, in which to carry on the ordinary transactions and commerce of life, as also courts of justice, and all other civil and political institutions, requisite to secure private interests, and to maintain the order and peace of public society. The lawful government was wholly unable to extend its care and protection over that people, for years, and it became absolutely necessary for them there-

1873.
January
Term.

Matthew Har-
rison, ex'or of
Burr W. Har-
rison, dec'd.
v.
The Farmers'
Bank of Va.

ore to provide for themselves all the necessary appli-
ances of civil institutions, as well as a currency, for their
comfort and welfare. This rebel government therefore be-
ing in the possession of such ample power was certainly a
government *de facto,* to whose authority it was prudent for
its citizens to submit.   It seems to me now to be required
by every principle of propriety and of reason, that the
courts of the land, respect the validity of the transactions
and  contracts of  that people growing out of their civil
and private relations during · that period,  and not de-
signed to aid in maintaining the rebellion.   To hold
otherwise, we can  imagine at least, might disturb the
private and domestic relations of an  entire community
for no purpose, and to effect no good.   Though any im-
minent danger of this kind has passed away perhaps, yet
the principle remains the same.   This seems to me  a
most reasonable doctrine as applicable to the *de facto* gov-
ernment able to maintain its authority.   In full confir-
mation of their views.   Judge Robertson, in Hildreth's
Heirs *vs.* McIntire's devisee, 1.   J. J. Marshall, p. 206, says
" when the government is entirely revolutionised, and all
its departments usurped by force, or the voice of a majority,
then prudence recommends, and necessarily enforces obedi-
ence to the authority of those who may act as the public func-
tionaries ; and in such a case, the acts of a *de facto* executive,
a *de facto* judiciary, and of a *de facto* legislature must be re-
cognized as. valid.   But this is required by political ne-
cessity.   There is no government in action, excepting
the government *de facto ;* because all the attributes of
sovereignty, have by usurpation, been transferred from
those, who had been legally invested with them, to oth-
ers, who sustained by a power above the forms of law,
claim to act, and do act in their stead."   This striking
picture of the true state of things in the south, was
drawn by this eminent jurist before the war, in a time
of profound peace, indicating the duties, which·prudence
dictated to its inhabitants, and the proprieties, judicial
and otherwise, to be observed in regard to their condition.

1873.
January
Term.

Matthew Har-
rison, ex'or of
Burr W. Har-
rison, dec'd.
v.
The Farmers'
Bank of Va.

It is not strange, considering, as I have before intimated, the subtle and difficult questions springing from our complex system of government before the war, and the still more difficult and intricate questions springing from the changed relations and attitude of the insurrectionary states, and from the wreck and overthrow of their governments by civil and military force, since the war, and the many and tremendous evils which have followed ; it is not strange I say, under these circumstances, that with such a burden of difficult, novel and unprecedented question, to which the history of the law and of civil government no where else presented any parallel, pressed upon the attention of our courts, they should not have found for them, in every instance, the proper solution. I am aware that the doctrine upon this subject is different from that presented in the cases of Brown vs. Wylie, 2, W. Va., 502 ; and Calfee, Adm'r vs. Burgess, 3, W. Va., 274. But the absolute necessity of a people submitting to the authority of a government, which they cannot resist, and of providing the requisite means of securing ther subsistence, their welfare, and all their private domestic, and civil interests, which is the inherent right of all men, lead us to respect their transactions and contracts, not designed to aid the accomplishment of a wrongful object; while on the other hand for the Courts to withhold this respect, is adapted at least to throw all their affairs into hopeless confusion. The doctrine thus held simply effects good, and avoids evil. This is not in my judgment, a question of loyalty or disloyalty, and involves no consideration of guilt or innocence, or of any treasonable or illegal purpose of any kind, in the conduct of the parties. A different view of the act of the parties under similar circumstances, leading the Court, in the cases referred to in 2 and 3, West Va., to attach to the act an *illegal and immoral character*, naturally and properly led to a different decision.

The government of the United States was assailed by

1873.
January
Term.
Matthew Harrison, ex'or of Burr W. Harrison, dec'd.
v.
The Farmers' Bank of Va.

all the power of the Confederate States; the power of their central government, says Chief Justice Chase, was recognized as supreme in nearly the whole of the territory of the States confederated in insurrection. The consequences necessarily following from this actual supremacy of the insurgent government are stated in the conclusion of his opinion where it is said, "they, (that is, contracts stipulating for payments in the currency of the Confederate States) are transactions in the ordinary course of civil society, and, though they may indirectly and remotely promote the ends of the unlawful government are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection. We cannot doubt that such contracts should be enforced in the Courts of the United States, after the restoration of peace to the extent of their just obligation." These views given by the Supreme Court of the United States interpreting and administering its Constitution and laws, may very safely and properly in this instance be adopted by this Court.

Other cases might be cited, but it is deemed unnecessary to extend this opinion any further on this point. The special pleas in this case are immaterial, and even if proved, would avail nothing.

Upon these pleas, and the facts proved, which are certified to this Court, the Circuit Court, to which the whole case was submitted, rendered judgment for the Defendants, and to this judgment the Plaintiff excepted, and the question is thus presented: was this judgment in accordance with the law and evidence?

A jury being waived by the parties, the whole case was submitted to the Court, which then discharged the functions of a jury, in weighing and considering the evidence, and "having maturely considered its judgment to be given in the premises," was of opinion that "the issues were for the Defendants," and the case is before this Court, as upon a motion for a new trial: all the

1873.
January
Term.

Matthew Har-
rison, ex'or of
Burr W. Har-
rison, dec'd.
v.
The Farmers'
Bank of Va.

*facts* in the case are certified, not the evidence, to this Court, and on the clear and express authority of the Supreme Court of Virginia, as found in the case of Slaughter's Adm'r *vs.* Tutt, 12 Leigh 147, when this has been done, the revising Court having the same lights, and acting upon the same data as the inferior Court, may draw its own conclusions of law upon the facts, as fully as the Court below. Judge Allen says, "if the Appellate Court has the same lights and proceeds upon the same data as the jury and the trying Court, there would seem to be no sufficient reason, why it should not draw its own conclusions, uninfluenced by the judgment and verdict." I may premise here, that no question founded upon unlawful business or transactions between parties residing at the time in different countries at war with each other, arises in the present case: the petition of the Plaintiff is no part of the record, and the record itself does not raise the point, or furnish any facts upon that subject.

I will notice briefly the facts touching the truth of the pleas : The claim of the Plaintiff originates from three orders drawn by his testator on the second Auditor of Virginia for interest on stocks of that State owned by him; which orders were payable to the Cashier of the Farmers' Bank of Virginia; and which orders were collected by said Cashier, and deposited by him, as so much cash, or so many dollars, to the credit of Burr W. Harrison, in said Bank, amounting in the aggregate to $2,880; the Plaintiff's claim is thus clearly established. There is no proof even tending to show payment or satisfaction of this claim in any way whatever: Is there sufficient proof of the allegation of the special plea, that "it was understood and agreed between the Defendants, and the said Burr W. Harrison, that these deposits were to be paid and returned to him in Confederate Treasury notes." The language of this plea must be held as meaning an *express*, not an implied agreement, and these are all the facts in proof, to-wit; that during the time of these trans-

1

1873.
January
Term.

Matthew Harrison, ex'or of Burr W. Harrison, dec'd.
v.
The Farmers' Bank of Va.

actions the State of Virginia was receiving these Treasury notes in payment of taxes, and was paying out the same for the interest due upon her stocks, and that these notes constituted the principal, if not the only currency at Richmond during that time. These facts do not even prove knowledge on the part of Burr W. Harrison, of the character of these deposits; he was not so informed in the letters he received from the Cashier, informing him of the deposits as having been made in cash, or so many dollars; and knowledge on his part of this fact was essential to an even implied agreement on his part to receive these notes in payment to himself. There is no proof in the record to show that at the time of these transactions, the said Confederate treasury notes were not worth their par value in the lawful currency of the country.

The proof which undertakes to sustain a plea setting up an agreement on the part of the Plaintiff's executor, entirely different from any thing appearing on the face of the transaction, not according with the information furnished to him by the Cashier, and designed to bar the recovery of his debt, should be clear, full, and explicit. This in my judgment is not its character, and I think the pleas are not proved, and that in this respect, the judgment of the Circuit Court was manifestly against the law and evidence.

An objection was made before this Court, which was not made in the trial of the case in the Court below, to-wit: that no demand was proved to have been made for these deposits before the suit was brought. Without deciding this question, we think the objection comes too late before this Court. The declaration alleges that said demand was often made; pleas were filed, issues joined, evidence taken, the trial had, judgment rendered, and no exception whatever was taken at the proper time, that there was no evidence given by Plaintiff of, what the Defendants now regard for the *first* time as a material fact. This practice, we can readily see, is fraught with surprise, and might work gross injustice in many cases.

1873.
January
Term.

Matthew Har-
rison, ex'or of
Burr W. Har-
rison, dec'd.
v.
The Farmers'
Bank of Va.

In the case of Taylor *vs.* Armstead 3 Call 200, the Court say that there was no ground for excepting that a demand and refusal had not been made in that case, because the Defendant by appearing and contesting the claim, had rendered it unnecessary, that further proof with regard thereto, should be stated in the record. In the case of Cook, Sheriff, *et al.*, *vs.* Hays 9 Gratt 142, a similar objection was made for the first time in the Supreme Court of Virginia, as is made in the case before us, but the objection was not permitted to prevail, the Court saying, "it would be attended with great inconvenience and injustice to allow the Plaintiffs in Error after making defence upon one ground, in the Court below, to surprise the Defendant in Error by making another defence here." The judgment in the Court below is reversed, and judgment entered for the Plaintiff on the facts certified in the record, for the amount of his debt, and his costs in this Court. This opinion is concurred in by Judges, Moore and Haymond, and is the opinion of this Court.