# CHARLESTON.

## CLAY v. ROBINSON, ADMINISTRATOR.

### March 2, 1874.

1. J. Marcus Alderson, who resided in the county of Greenbrier, in the State of West Virginia, died, in said county, in the year 1863, prior to the 26th day of October, 1863, intestate. The State of West Virginia, was formed out of the State of Virginia, after the commencement of the late civil war, and the government of West Virginia was organized and went into operation at the city of Wheeling, under a constitution, on the 20th day of June, 1863. At the commencement of said war, the government of Virginia, at Richmond, the capital of the State of Virginia, adhered to, and aided the late Confederate Government, (so called) in said war with the United States. About the commencement of said war a part of the people of the State of Virginia, organized a government for the State of Virginia, at the city of Wheeling, called the Restored Government of Virginia, which Government was recognized by the government of the United States, as the lawful Government of the State of Virginia, throughout the war. In the State of Virginia, before, and during, the war, there was held in each county, a county court, with authority to appoint administrators, and to revoke the appointment of such fiduciaries in certain cases. County courts were unauthorized, by the constitution and laws of West Virginia, and by the laws of West Virginia the Recorder, alone, of each county, was authorized to appoint administrators. The restored Government of Virginia, and the government of West Virginia, was never organized in Greenbrier county, during said war, but said county was held by the military forces of the Confederate Government, and of the government of Virginia, at Richmond, during all that time. And during the war the said county court held its sessions in said county, and appointed administrators, &c. On the 26th day of October, 1863, after the organization of the government of West Virginia, at Wheeling, and contrary to the laws thereof, the said county court of Greenbrier county appointed Malinda S. Alderson, administratrix of said J. Marcus Alderson, deceased. After-

wards, and after the end of the war, and on the 16th of December, 1868, *William* Robinson was appointed administrator of the estate of said Alderson, deceased, by the Recorder of said county. Afterwards C., brought an action of debt in the circuit court of said county, against said Robinson (as administrator) to recover a debt claimed to be due from his intestate. Robinson filed a plea in said action of non-admistrator, to which a general replication was filed and issue joined.—HELD :

That Robinson was, after his appointment, the proper administrator of said decedent Alderson, and that he was properly sued as such, and that although the acts of said Malinda S. Alderson, as administratrix of said Alderson, prior to the laws of West Virginia being extended over and enforced in the said county, and the apment of said Robinson as administrator, will be recognized as valid generally—still whatever authority she may have had as administratrix, as aforesaid, ceased on the appointment of said Robinson, as administrator, if not before, although she had no notice of such appointment.

2. C., brought an action of debt against R., administrator of A., to recover the amount of a bond made by A., and another, to C., in the lifetime of A. One of the pleas in the cause was payment, on which issue was joined. At the trial, C., to maintain the issue on his part, gave in evidence to the jury the said bond dated 9th of August, 1859. R., then, to maintain the issue on his part, read in evidence, a paper writing purporting to be a receipt from C., plaintiff, to A., deceased, in full of all demands, dated October 15th, 1860; C., denying the genuineness of said receipt, and of the signature thereto, was then permitted, by the court, without objection, to prove to the jury, by evidence, that the body of said bond was in the hand writing of C.—HELD :

That, after the court had so allowed the proof, that the body of said bond was in the hand writing of the plaintiff to go to the jury, without objection, as aforesaid, it was error in the court to permit a witness, who was an expert, and who was not acquainted with the hand writing of C., to give as evidence his opinion, (founded solely upon the comparison of the hand writing of the body of said bond, and the signature to said receipt,) that the body of the bond and the signature to the receipt was not written by the same person, as the fact that the body of the bond was in the hand writing of C., plaintiff, does not appear to have been admitted by the defendant, or that the defendant was in any way estopped from denying the fact; and it not appearing that the said bond, or receipt, belonged to the witness, who was himself previously acquainted with the parties' hand writing, and exhibited them, or either of them, in confirmation or explanation, of his own testimony. (Perhaps other cases may arise where such evidence would be admissable, and cases also which should be held to be

1874.
January Term.

Clay
v.
Robinson.

exceptions to the rule which is not now determined.)  Here the writings were not of ancient, but of comparatively recent date, and witnesses were examined who were acquainted with plaintiff's hand writing.

3. The plaintiff having examined witnesses to impeach the character of ——— Miller, for truth and veracity, the defendant, to sustain the character of his witness, Miller, introduced before the jury, a witness, and asked him if he knew the character of said Miller, for truth and veracity, among his neighbors, and he replied, "I cannot say I do." Witness then said he resided four or five miles from said Miller, and had known him for four or five years, and that he had never heard a word against him as a man of truth and veracity. And thereupon, the defendant asked the witness "whether he would, or would not, believe said Miller upon oath."—HELD:

That the court properly refused to permit the witness to answer the question.

4. Where issues are joined upon pleas of payment and of non-administrator the plaintiff, is entitled to open and conclude the argument of the cause before the jury.

5. Where an instruction is given to the jury by the court, at the instance, of the plaintiff which does not correctly propound the law, but it is manifest from the record, that the defendant could not, thereby, have been prejudiced or injured the appellate court will not reverse the judgment of the court below on account of such instruction.

A *supersedeas* to a judgment of the circuit court of Greenbrier county, by Wallace Robinson, who, as Sheriff of said Greenbrier county, and as such, administrator of J. Marcus Alderson, deceased, was the defendant below, in an action of debt wherein Thomas G. Clay was plaintiff. The judgment was rendered on the 24th of June, 1873. The material facts sufficiently appear in the opinion of the Court.

The Hon. Homer A. Holt, judge of said circuit court, presided at the trial below.

*Samuel Price* and *James W. Davis*, for the appellant.

*John W. Harris* and *Mathews & Mathews*, for the appellee.

HAYMOND, PRESIDENT:

This is an action of debt brought in the circuit court of the county of Greenbrier, by the plaintiff against the

1874.
January Term.

Clay
v.
Robinson.

defendant as sheriff of that county, and as such adminis-
trator of J. Marcus Alderson, deceased. The action
was commenced on the 29th day of May, 1869. At the
circuit court held on the 23rd day of October, 1869, the
office judgment had in the cause was set aside on the de-
fendant appearing in conrt, by his attorney, and filing a
plea of payment, to which a general replication was had.
Afterwards on the 5th day of December, 1871, the par-
ties appeared in court by their attorneys, and a jury was
duly sworn, and empanelled to try the issue joined, and
the jury found a verdict in favor of the plaintiff, for
$652.50, debt, with interest thereon, from the 7th day of
December, 1871, till paid. The defendant moved the
court to set aside the verdict of the jury, and grant him
a new trial in the cause. The motion was sustained by
the court, and a new trial granted. The reasons for
which the court granted a new trial do not appear in the
record. Afterwards on the 6th day of June, 1873, the
defendant, by leave of the court, filed an additional plea,
in which he denied that he was then, or ever had been,
administrator of the rights and credits of the decedent,
Alderson. It appears, that afterwards, during the same
term, the plaintiff objected to the filing of the plea, but
the objection was overruled; and thereupon the plaintiff
filed a general replication to the plea, and issue was
joined. At the same term, a jury was duly empanelled
to try the issues joined, and found in favor of the plain-
tiff a verdict for $686.25. Whereupon the defendant
moved the court to set aside the verdict, and grant a new
trial. Afterwards, on the 24th day of June, 1873, the
court overruled the motion for a new trial, and rendered
judgment in favor of the plaintiff, upon the verdict of
the jury. The defendant filed exceptions to several rul-
ings of the court during the trial, and, also, to the opin-
ion of the court refusing a new trial. By bill of excep-
tion No. 1 it appears, that during the trial the plaintiff
in support of one of the issues joined, read in evidence
to the jury an official copy of an order made by the Re-

corder of Greenbrier county, on the 16th day of December, 1868, in these words, viz : "J. Marcus Alderson, of this county, having died intestate more than three months ago, and no person having applied for administration of his goods and chattels, on the motion of Thomas G. Clay, it is ordered that *William* Robinson, sheriff of this county, take the estate into his possession, and administer the same according to law." The defendant read in evidence to the jury a paper writing purporting to be a copy of an order made by the county court of Greenbrier county, which is in these words viz : "Greenbrier county court, October 26, 1863. On motion of Malinda S. Alderson, who made oath, and together with William M. Patton, and Nathan Perry, her securities, entered into, and acknowledged a bond, in the penalty of $4,000, conditioned according to law, certificate is granted the said Malinda S. Alderson for obtaining letters of administration upon the estate of John Marcus Alderson, deceased, in due form. A copy teste : Mark L. Spotts, clerk." The plaintiff also proved to the jury that said Malinda Alderson, had, on the 16th day of March, 1870, intermarried with one Wm. G. Miller, and also proved that he had defended suits brought against him as administrator of the estate of said Alderson, deceased, and had consulted a lawyer about the business, and had otherwise acted as such administrator, in pursuance of the order committing the estate to him ; and then introduced a witness, and proved by him, that Henry Robinson, was the deputy of Wallace Robinson, and had acted as deputy sheriff of said Wallace, and then asked the witness to tell what Henry Robinson had done in administering the estate of said Alderson, and the defendent objected to the question, and his objection was overruled, and he excepted ; and the witness answered, that Henry Robinson had caused an execution to issue in a case in which Wallace Robinson had been sued, as administrator, and that he, Henry Robinson, had paid witness, who was deputy clerk, a fee bill ; and the defen-

dant objected to the answer, and asked that it might be excluded from the jury, and the court refused to exclude it, and the defendant excepted. After the evidence was closed, the plaintiff asked the court to give to the jury this instruction, to-wit : "That although Malinda S. Alderson, may have been appointed administratrix of the personal estate of John Marcus Alderson, deceased, on the 26th day of October, 1863, by the county court of Greenbrier county, yet, if they believe from the evidence that she intermarried with William G. Miller, on the 17th of March, 1870, and that the estate of said Alderson, was, by the Recorder of said county, on the 16th December, 1868, committed to defendant Wallace Robinson, as sheriff of said county, to be administered, and that in pursuance of said order, he acted as such administrator, then they must find for the plaintiff on the issue joined on the plea of *non administrator*. The defendant by his attorney, objected to the court giving this instruction, but the court overruled the objection, and gave the instruction to the jury.

1874.
January Term.

Clay
v.
Robinson.

It appears by bill of exceptions No. 2, that the defendant, by his attorney, after the evidence was closed, asked the court to give to the jury the following instructions, viz : 1st. That the order of the county court of Greenbrier county made on the 26th day of October, 1863, and the same read to them, cast the administration of the estate of John Marcus Alderson on Malinda S. Alderson, and she thereby became the administratrix of said estate, and so continued unless she was removed therefrom ; and that she was not removed from her office of administratrix, aforesaid, by reason of the order of the Recorder of Greenbrier county, made on the 16th day of December, 1868, and the same read to the jury.

2d. That if Malinda S. Alderson, was appointed administratrix, of the estate of John Marcus Alderson, she was not removed by the effect of the order of the Re-

45

corder of Greenbrier county, made on the 16th day of December, 1868, and read in evidence to the jury.

3rd. If the jury believe from the evidence, that on the 26th of October, 1863, Malinda S. Alderson was appointed administratrix of the estate of John Marcus Alderson, and she had not been legally removed from her said office, on the day this suit was instituted, then she was the rightful administratrix, and Wallace Robinson was not the administrator of John Marcus Alderson, and the jury must find for the defendant, on the plea of never administrator:

All of which three instructions so asked by the defendant, the court refused to give.

For convenience I will first consider if the circuit court erred in refusing to give the instructions asked by the defendant. To determine this question properly it is necessary to recur to the time this State became a separate State of the Union, the state and condition of things within her limits, and especially in October, 1863, when Malinda Alderson is claimed to have been appointed administratrix of Alderson, deceased, by the county court of Greenbrier. It is also necessary to consider parts of the Constitution and laws of this State in force before, and at the time, of such appointment of Mrs. Alderson. The Constitution of this State under which she became a separate State, took effect on the 20th of June, 1863, and on that day the government of the State became organized, and operative. The fifth section of article seven of the State Constitution, then in force, provided, that the voters of every county should elect a Recorder, and that he should hold his office for two years. The sixth section of the same article provides, among other things that the Recorder shall have authority to appoint and qualify personal representatives under such regulations as may be prescribed by law. There was, at the time of the formation of this State, and for many years before, county courts in each county of Virginia, which had authority to appoint personal representatives, and

these county courts continued to exist in Virginia until after the year 1863. On the 3rd day of September, 1863, the Legislature of this State passed a law providing that Recorders of every county shall have the same power to hear proof of, and admit wills and authenticated copies thereof to probate, to appoint, take bonds from, and qualify or remove personal representatives, that the county courts of the respective counties had on the 19th day of June, 1863. See Acts of 1863, chapter thirty-six page thirty-five. The Constitution and laws of this State did not recognize, or provide, for any such tribunal as the "county court," and under the Constitution and statute laws of the State after the 20th of June, 1863, and for several years subsequent, county courts had no existence. But this State was formed during the late great Civil War, from the territory of Virginia. Prior to and at the time of the commencement of the war the seat of government of Virginia was at the city of Richmond. About the time of the commencement of the war the authorities of the government of Virginia, at Richmond, adhered to and united with the Confederate States in the war with the United States, and so did a large portion of the citizens of Virginia, and in fact the larger part of the counties thereof. Soon after the government of Virginia, at Richmond, became identified with the Confederate States, in the war, another government of Virginia, known and called as the Restored Government of Virginia, was organized and established at the city of Wheeling, where it existed until the formation of this State. The Restored Government of Virginia was recognized by the government of the United States from its organization, as the lawful government of Virginia. The government of this State recognized as the lawful government of the State by the government of the United States, with its seat of government located at Wheeling as the temporary capital, adhered to and aided the government of the United in the war. "It had its troops in the field aiding the

Federal forces to maintain, not only the Federal, but its own authority over its territory; but, nevertheless, the Confederate troops held the county of Greenbrier by paramount force, and thus maintained over it the State organization and authority, which adhered to the Confederate cause and held its capital at Richmond." However much the citizens of Greenbrier county might have desired to have organized under the Constitution and laws of this State, they could not do so, and have the Constitution and laws enforced among and over them. They could not do so, because of the *paramount force* of the State government at Richmond; and although that government was declared to be an unlawful government, it was nevertheless, an actual government of paramount force at that time. Or, in other words, it was a *de facto* government. See *Texas v. White,* 7 Wall. (Sup. Ct. U. S.) opinion of judge Chase, page 733; *Thorington v. Smith,* 8 Wall., (Sup. Ct. U. S.) 1; *Griffin v. Cunningham,* 20 Gratt., 31; *Sherfy v. Argenbright,* 1 Heiskel, (Tenn.) 128; *Harrison, Exor., v. Farmers' Bank of Virginia,* 6 W. Va. 1; *Henning v. Fisher, Id.* 238.

The constitution and laws of this State were not, and could not be, for the reasons above stated, extended over and enforced in the county of Greenbrier until about the time or after the surrender of General Lee's army at Appomattox Court House, Virginia. Hence it is there was a county court held in the county of Greenbrier in October in 1863, and it was that court that appointed Mrs. Alderson administratrix of Alderson, deceased. As I stated, the county court in Greenbrier was held and maintained contrary to the Constitution and laws of this State. An administrator is the mere creature of law, and is not a public officer. As Mrs. Alderson was appointed administratrix, as above stated, only, she cannot be considered or held to have been appointed administratrix in pursuance of the laws of this State. But as such administratrix, thus appointed, her acts from public policy and necessity, on the authority of the case

of *Texas v. White*, 7 Wall. (Sup. Ct. U. S.) 700; *Thoring-ton v. Smith*, 8 Wall., (Sup. Ct. U. S.) 1; and *Henning v. Fisher*, 6 W. Va., 238, above cited, must be recognized, as valid, generally, though prior to the Constitution and laws of this State being extended over the county of Greenbrier and therein enforced; and the appointment of an administrator of the estate was regularly made by the Recorder in accordance with the laws of this State. In the case of *Texas v. White*, 7 Wall., (Sup. Ct. U. S.) 700 Judge Chase says : "Acts necessary to peace and good order among citizens, such for example, as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating the conveyance and transfer of property, real and personal, and providing remedies for injuries to person and estate, and other similar acts which would be valid, if emenating from a from a lawful government must be regarded, in general, as valid, when proceeding from an actual, though unlawful, government." The act of the Legislature of this State, approved March 31st, 1872, page 168, among other things, only makes valid any act or deed done and performed in certain of the counties of this State by any executor, administrator, or other fiduciary who qualified in Virginia, &c. It seems to me that when the law of this State became extended over the county of Greenbrier, and it was enforced by the Recorder, by the appointment of an administrator, as in this case, every possible authority of Mrs. Alderson as administratrix ceased by operation of law, if it did not terminate before. The act of the Legislature makes valid the acts of certain officers between the 17th day of April, 1861, and the time of the organization of this State in the counties &c." It is known that when the war ended, and the various counties of this State were organized under the Constitution and laws thereof, as in the county of Greenbrier, that the appointments of personal representatives made during the war, after the formation of his State, by the county courts were held and treated as null by the authorities of this

State ; and in many instances, if not in all, where there was any estate, administrators were appointed by the Recorders, just as though there had been no previous administration. And to hold now that the last appointments were null and void, because there was, previously, administrators, of the description named, might be productive of great loss and injustice, and I would not feel it to be right to so hold, under the circumstances, unless the law of the case was so clear in that direction as not to admit of reasonable doubt. The questions arising and growing out of the complications of the war in this State are exceedingly difficult, and must be decided, in many instances, in the absence of precedent, and we are compelled, in a great degree, to look to the attainment of justice. The cases cited by counsel for appellant in 8 Cranch, Virginia and other States, are not applicable here. These were cases where executors and administrators had been regularly appointed in times of profound peace, and in accordance with the laws of the State, They were not encumbered with the embarrassments of this case. Under the circumstances, while I hold the acts of Mrs. Alderson, as administratrix as aforesaid, if she ever did any after she qualified as such, which does not appear in this case, with some qualifications, to be valid : still I hold that the appointment of the defendant was proper and valid, and that by virtue of the appointment, he became the sole administrator of the estate of Alderson, deceased, then unadministered by the administratrix, and that he, and he alone, was the only person against whom this suit could have been brought at the time of its institution. Entertaining these views, the circuit court did right in refusing to give the three instructions asked by the defendant.

This brings me to the consideration of the instruction asked by the plaintiff and given by the court. While I do not think that this instruction propounds the law correctly, when taken altogether, still I am clearly of the opinion, under the views above expressed, that the

defendant could not have been, thereby, prejudiced in the least, as the court should have instructed the jury that if they believed from the evidence that the estate of Alderson, deceased, was, by the Recorder of Greenbrier county, committed on the 16th day of December, 1868, to the defendant, Wallace Robinson, as sheriff of said county, to be administered, then they should find for the plaintiff, on the issue joined, on the plea of non-administrator. Robinson, under the appointment of the Recorder, and by force thereof, was the administrator, under the circumstances. whether Mrs. Alderson married before or after his appointment. With this view of the question the judgment should not be reversed simply because the instruction was not correctly propounded as it is clear that the appellant could not have been prejudiced thereby.

It further appears by bill of exceptions No. 1, that the plaintiff, to sustain the issue on his part, gave in evidence to the jury, the bond in the declaration mentioned, which is for $375, dated 9th day of August, 1859, payable at its date, with interest from date, and signed and sealed by J. Marcus Alderson and T. B. Patton, and afterwards the defendant, to sustain the issue on his part, gave in evidence to the jury a receipt in these words, viz: "Received of J. Marcus Alderson, $496, payment in full of all demands," dated October, 15th, 1860, and signed with the name of Thomas G. Clay, and attested, by Lewis Miller. And thereupon, the plaintiff who denied the genuineness of said receipt, and the signature thereto, purporting to be his, after having proved that the body of said bond was in the hand writing of plaintiff, (the evidence as to the genuineness of said receipt being conflicting,) called and had sworn, as a witness, James Montgomery, and asked him "what his occupation had been," and the question was objected to by defendant, and the objection overruled and the defendant excepted; and the witness answered that "he had been for ten years teller in the Bank of Lewisburg, and

had been in the habit, as part of his business, of comparing hand writings and signatures," and the defendant objected to the answer, and his objection was overruled, and he excepted. The plaintiff then asked the witness if his business had not given him an opportunity to compare hand writings, and if he had not thereby become more competent to compare hand writings, and thereby detect the false from the true, than ordinary persons, and the defendant objected to the question—the objection not going to the form of the question—but his objection was again overruled and defendant excepted. The witness answered "that his business had, in his opinion, made him more competent than ordinary persons to detect, by comparison of hand writing, a genuine from a simulated writing," and the defendant objected to the answer, but his objection was overruled, and defendant excepted. And the plaintiff then gave the witness the bond sued on, and the receipt attested by Miller and asked him whether or not, the body of the bond and the signature to the receipt, were written by the same person, and the question was objected to by the defendant, and his objection was overruled, and defendant excepted. The witness answered that "in his opinion the body of the said bond and the signature to said receipt attested by Lewis Miller, were not written by the same person." The defendant objected to the answer, and asked the court to exclude it from the jury, but the court overruled the objection and permitted the answer to remain before the jury, and the defendant excepted. It is expressly stated in the bill of exceptions that none of the foregoing questions were objected to on account of form. It does not appear that the defendant objected to the plaintiff proving before the jury that the body of said bond was of the hand writing of the plaintiff.

The only question presented here, is whether the court erred in permitting the evidence of James Montgomery, to go before the jury. Montgomery in his evidence, does not pretend to be acquainted with

the hand writing of plaintiff. If Montgomery's, evidence is admissible at all, it must be, because he is an expert in distinguishing between hand writings, and that it is competent for him, as an expert, without having any acquaintance with the hand writing of the party, to give his opinion to the jury as evidence, as to which is the genuine and which the false, or assimulated, or rather in this case whether an expert who has no acquaintance with the hand writing of the party, shall be allowed to give his opinion, founded solely, on a comparison of hands, or the the juxtaposition of two writings for the purpose of ascertaining whether both were written by the same individual. The general rule seems to be that to render a witness competent to give his belief, as to hand writing, he must have some personal knowledge of the hand writing of the person whose writing is in question; which may be acquiring in different ways. 1 Green., Ev. section 577. To this rule says Greenleaf 1 vol. on Ev. section, 578, there seems to be two exceptions to-wit: (1.) Where the writings are of such antiquity that living witnesses cannot be had, and yet are not so old as to prove themselves: (2.) Where other writings. admitted to be genuine, are already in the case. Here the comparison may be made by the jury, with or without, the aid of experts. The reason assigned for this is, that as the jury are entitled to look at such writings for one purpose, it is better to permit them for all purposes, than to embarrass them with impracticable distinctions, to the peril of the cause. In the case under consideration, the body of the bond does not appear to have been admitted to be in the hand writing of the plaintiff, nor was the signature to the receipt; and it does not appear in any way, that the defendant was estopped from denying the hand writing of the body of the bond being that of the plaintiff. It does appear that the said bond was produced by the plaintiff. The bond, the court says, in the bill of exceptions, was proved to be in the

46

hand writing of the plaintiff, and the hand writing of the receipt or rather the signature thereto, was in dispute; and as bill of exceptions No. 2, certifying a part of the facts proven, and evidence, says, the evidence as to the genuineness of the receipt was conflicting. In the case of *Rowt's Administratrix v. Kile's Administrator*, 1 Leigh., 216, "upon the trial of the issue, on a plea of *non est factum*, whether the parties signature to the instrument in question, be genuine or no; *held* inadmissible to lay other proved specimens of the party's hand writing before the jury, that it may judge by comparison thereof with the writing in question, whether this be genuine. Such comparison of hand writing is not proper evidence." According to this decision, it was not competent for the plaintiff to prove before the jury that the body of the bond in evidence was in his hand writing for the sole purpose of instituting, by the jury, a comparison of the hand writing of the receipt, and body of the bond, to determine, the genuineness or falsity of the signature to the receipt and that the receipt or signature thereto were not of the hand writing of the plaintiff. Before the introduction, and admission of the receipt it was wholly immaterial, whether the body of the bond was in the hand writing of the plaintiff or not, and proof of the hand writing of the bond after the receipt was given in evidence for the sole purpose of enabling the jury to institute a comparison of hand writing under the circumstances was not permissible according to the case in 1 Leigh., above cited. The principle involved is no other than that repudiated in the case in 1st Leigh.; Greenleaf, in his 1 vol. on Ev., sec. 581 says: "But with respect to the admission of papers irrelevant to the record, for the sole purpose of creating a standard of comparison of hand writing the American decisions are far from being uniform. If it were possible to extract from the conflicting judgments a rule, which would find support from the majority of them, perhaps it would be found not to extend beyond this; that such papers can

be offered in evidence to the jury, only where no collateral issue can be raised concerning them; which is only where the papers are either conceded to be genuine, or are such as the other party is estopped to deny; or are belonging to the witness, who was himself previously acquainted with the party's hand writing, and who exhibits them in confirmation, and explanation of his own testimony. See notes two and three to said section for cases cited. Admitting that the witness Montgomery had sufficient knowledge and experience to constitute him an expert, still I think upon principle and the weight of authority in England and America that under the circumstances as shown, the court erred in allowing the witness to state, as evidence to the jury, his opinion, that the body of the bond sued on and the signature to the receipt, attested by Lewis Miller, were not written by the same person. If the bond and receipt were of mere ancient date it might be different. *Hawkins v. Grimes*, 13 B., Mon. (Ky.) 257; *The People v. Spooner*, 1 Denio. (N. Y.) 343; *Vanwick v. McIntosh*, 4 Kernan (N. Y.) 439; *Rowt's, Administratrix v. Kile's Administrator*, 1 Leigh., 216; 1 Green. on Ev., 581.

It might also be different if the body of the bond was admitted to be in the hand writing of the plaintiff or the defendant was estopped to deny the fact, or the bond belonged to the witness who was himself previously acquainted with the party's handwriting; and perhaps other cases may arise where such evidence would be admissible and cases also which should be held to be exceptions to the rule, but as to this it is now unnecessary to express an opinion.

The plaintiff having introduced witnesses to impeach the character of Lewis Miller, for truth and veracity, who it seems was a witness introduced and examined by the defendant in support of the issue, on his part, the defendant introduced a witness, and asked him if he knew the character of Lewis Miller, for truth and veracity, among his neighbors, and he replied: "I cannot say I

1874.
January Term.

Clay
v.
Robinson.

do." The defendant then asked him how far he lived from Lewis Miller, and he answered, four or five miles. Defendant then asked him how long he had known Lewis Miller, and he answered, about four or five years. The defendant then asked him if he had ever heard a word said against him as a man of truth and veracity, and he replied, he had not; and, thereupon, the defendant asked him to tell whether, or not, he would believe Lewis Miller upon oath, but the plaintiff objected to the question, and his objection was sustained, and the witness was not permitted to answer the last question, and the defendant excepted. The question here presented is, simply, whether the court erred in refusing the witness to answer the question last above named. In this State, and in Virginia, the courts have generally adhered, in an attempt to impeach a witness for truth and veracity, to the rule adopted, and affirmed in *Uhl's Case*, 6 Grattan, 706. The rule in that case seems to be very much like the rule adopted by the courts of England.

In 1 vol. of Green on Ev., sec. 461, it is said, "after a witness has been examined, in chief, his *credit may be impeached* in various modes besides that of exhibiting the improbabilities of a story, by a cross-examination. (1.) By *disproving* the facts stated by him by the testimony of other witnesses. (2.) By general evidence affecting his credit for veracity. But in *impeaching* the credit of a witness, the examination must be confined to his general reputation, and not be permitted as to particular facts, * * The regular mode of examining into the general reputation is to inquire of the witness whether he knows the general reputation of the person in question, among his neighbors, and what that reputation is. In the English courts the course is further to inquire, whether from such knowledge the witness would believe that person, upon his oath. In the American courts the same course has been pursued, but its propriety has, of late, been questioned, and, perhaps, the weight of authority is now against permitting the witness to testify. In an-

1874.
January Term.

Clay
v.
Robinson.

swer to such evidence, the other party may cross-examine those witnesses, as to their means of knowledge, and the grounds of their opinion; or may attack their general character, and, by fresh evidence, support the character of his own witness. * * It is not enough that the impeaching witness professes merely to state what he has heard "others" say; for those others may be but few. He must be able to state what is generally said of the person, by those among whom he dwells, or with whom he is chiefly conversant; for it is this only that constitutes his general reputation or character. And, ordinarily, the witness ought himself to come from the neighborhood of the person, whose character is in question."

As before stated the rule in *Uhl's Case* permits the impeaching witness to say, on his oath, that from his knowledge of the general character of the witness sought to be impeached, he would, or would not, believe him on oath; but he is not permitted to state whether he would, or would not, believe him on oath until he has first stated on his oath that he knows his general character among his neighbors and acquaintances, and also his general character for truth among his neighbors and acquaintances, whether upon oath or otherwise. As before stated the rule in *Uhl's Case* has been generally sanctioned and adhered to, substantially, by the courts of Virginia, and of this State, in an attempt to impeach the character of a witness. But it is maintained that this rule should be relaxed in cases where the general character of the witness for truth and veracity, has been assaulted, and an attempt is made to sustain the character of the witness thus assaulted, and that the sustaining witness notwithstanding he is unable to state that he knows the general character of the assaulted witness, and is also unable to state that he knows his general character for truth and veracity among his neighbors and acquaintances, but states that he has known the assaulted witness for four or five years, and that he resided four or five miles from him, and that he had never heard a word against him as

a man of truth and veracity, should be permitted to tes-
tify to the jury whether he would or would not believe
the assaulted witness upon oath.  To sustain this propo-
sition the appellants' counsel has cited the case of *Lemons
v. The State* 4 W. Va., 755.  The question presented in
that case is very different from that presented here in
the *Lemons Case.*  "It appears that when the witness Mc-
Allister was introduced, the usual question whether he
was acquainted with the general reputation of the witness
McDowell, for truth and veracity among her neighbors
was propounded to him and having answered in the affir-
mative the question was then propounded to him, by the
court, whether he had ever heard any person speak of
her character for truth and veracity, and the witness
thereupon replied (in substance) that he had known her
for fifteen years and had never heard her character, in
'this respect questioned, and had never heard any person
say anything about her character for. truth and veracity ;
and thereupon the court excluded the witness, as incom-
petent, to testify as to the character of the witness, Mc-
Dowell, for truth and veracity.  The witness McAllister
had been introduced to sustain the character of the wit-
ness McDowell, whose reputation for truth and veracity,
had been impeached.  The question whether the witness
McAllister should be permitted to state whether he would
or would not believe the witness under oath, was not
presented, and was not passed upon.  But the witness
did state, on his oath, that he did know the general· char-
acter of the witness for truth and veracity among his
neighbors.  In this case Judge Berkshire said "it ap-
pears to me that a person who should prove by those, in
his community by whom he is well known, that his re-
putation for truth and veracity has never, so far as he
knows, been called in question or talked about among
his neighbors, might well claim, in the absence of evi-
dence to the contrary, to have shown at least a *prima facie*
case of good character in this respect, and to have pro-
duced the most direct and satisfactory evidence, to rebut

evidence of bad character, in case any may have been produced against him." In the case of *Buckie v. The State of Ohio*, 20 Ohio, justice Caldwell, says, "as to the charge of general bad character, if untrue, every person in the neighborhood can give specific evidence rebutting it. If not able to state affirmatively the person is well spoken of in the neighborhood, the witness can state that he knows of no such general bad reputation, which goes directly to rebut the allegation of its existence." No case has been cited or brought to our attention, showing, or tending to show, that the circuit court erred in refusing to permit the witness to state whether he would, or would not, believe Miller upon oath, under the circumstances disclosed by the record; and I think that the circuit court did not err in this respect.

The pleas in this case were a general plea of payment, and that the defendant was never administrator, &c.; to each of which there was a general replication and issue. On this state of the pleadings the plaintiff was entitled to open and conclude the argument of the case.

I have considered all the questions presented by bill of exceptions number one; and bill of exceptions number two is taken to the judgment of the court in overruling the defendant's motion for a new trial. The bill does not profess to state all the evidence or facts proven before the jury. And I have already considered several questions presented, and, indeed, all that I deem of any importance.

For the reasons above stated, the judgment rendered in this cause, by the circuit court of Greenbrier county, on the 24th day of June, 1873, must be reversed and annulled, the verdict of the jury set aside and a new trial awarded, with costs in this Court to appellant, and the cause must be remanded to said circuit court for further proceedings therein to be had according to law.

Paull and Moore, Judges, concurred. Hoffman, Judge, did not sit at the hearing of this case. by reason of sickness.

JUDGMENT REVERSED, VERDICT SET ASIDE, NEW TRIAL AWARDED AND CAUSE REMANDED.