# Charleston.

JOHN H. COPELAND, EXECUTOR, vs. WILLIAM A. McCUE et al.

January Term, 1872.

1. A demurrer to an answer is unknown in chancery practice. Where a cause is heard upon the bill and exhibits and answer, without replication thereto, everything in the answer must be taken as true.

2. C., as executor, received payment in Confederate treasury notes in Greenbrier county, in satisfaction of a bond for the amount of a legacy ordered to be loaned, and so loaned by him, before the rebellion, without any coercion on the part of the debtor. He invested the same in Confederate bonds at the instance of counsel. He seeks to be relieved upon the ground that he acted under advice, and as a prudent man would have done, &c. HELD:

    I. He is not entitled to relief, because it nowhere appears that he was compelled to receive the fund by the coercion of the debtor.

    II. The investment in Confederate bonds was, *per se*, wholly illegal; and no court ought to excuse or exonerate a trustee or fiduciary, from loss or liability resulting from their own acts, which were in themselves not only illegal, but in contravention of public policy.

    III. It was not error to decree personally against the executor, as there was, after the payment of debts, sufficient in his hands to pay the legacy, and he sought relief against its payment *only* on the ground of loss of the fund, occasioned by the late rebellion.

Bill in chancery filed in the circuit court of Greenbrier county, at rules held in January, 1870.

The bill alleged that the plaintiff's wife and Virginia Miller, her sister, were legatees in the will of Melinda A. Bowyer, who deceased in 1854; that the legacy was the sum of five hundred dollars, bequeathed to them, subject to the life estate of Mrs. William E. Bowyer, of Virginia, to whom the interest was to be paid annually by the executor; that one John H. Copeland was nominated as executor and qualified as such; that he made a settlement of his executorial accounts in 1860, and that it thereby appeared, after the payment of all debts, there was the sum of one thousand three hundred and seventy-one dollars and fourteen cents principal

and two hundred and forty-one dollars and ninety-two cents interest due from him to the estate; that the commissioner stated in the settlement that five hundred dollars of this sum should be appropriated to the payment of the legacy.

The bill further alleged the death of Mrs. William C. Bowyer on the 2d day of January, 1864, and that since then they had made frequent applications to the executor for payment of the legacy, and that he had failed and refused to make payment. They asked a decree against the executor for the amount of the legacy and interest.

The executor answered, admitting many of the allegations of the bill, generally those that were narrative, and averring that at the time the money came into his possession none of the banks paid interest on deposits, and if they had done so, that it would have been lost, as they subsequently became insolvent, and therefore he could only loan the amount of the legacy, and pay the interest thereon to the life beneficiary, Mrs. Bowyer; that at the time it became due from the party to whom it was loaned, the Confederate government had asserted its supremacy in the country where all the parties resided, and its treasury notes were the almost exclusive currency in that section; that if he had refused to take the treasury notes of the Confederacy in payment for the loanee's bond, he would have subjected himself to personal risk and danger from the Confederate authorities; that he did receive it in such notes; that at the date of Mrs. Bowyer's death, in 1864, the Confederate money had so depreciated in value that he could no longer loan it out at interest; that soon after her death he offered to pay the female plaintiffs, but they refused to take it—*i. e.*, in Confederate money; that he acted under the advice of counsel learned in the law, who advised him to invest the money in Confederate bonds, as the only means by which he could obtain interest thereon; which he accordingly did, and which he tendered to the female complainants, but they refused to receive it. He therefore submitted that inasmuch as he had acted with the best intentions, under legal advice, and as a prudent man would have done under like circumstances; and that he desired no benefit under the will but the lawful commission, and it was an onerous and ungracious task to execute the will at the request and for the bene-

fit of relatives; that a court of equity would not hold him responsible out of his own funds for a loss which the most prudent course had been unable to avoid.

It appears by the decree that was entered on the 23d day of June, 1870, that the cause was heard upon the bill and exhibits, answer of defendant and *demurrer* thereto. The decree sustained the *demurrer* to the answer, and decreed the payment of the legacy with interest thereon from the 2d day of January, 1864.

The defendant appealed to this court.

*Harris* for the appellant.

*Mathews & Mathews* for the appellees.

There is no controversy in this case about the facts. It is admitted that the legacy, claimed by the plaintiffs, was bequeathed, by the last will of the testatrix of the defendant, to them, and that sufficient assets remained in the hands of the executor, after payment of debts and other legacies, to meet and discharge this bequest, upon the death of Mrs. Bowyer, who was entitled to its use for the term of her life; the executor, however, as a defense to the claim here made upon him, alleges that when the loan, of the amount now demanded, which he had made for the benefit of Mrs. Bowyer, that she might use and enjoy the accruing interest, fell due, the Confederate States exercised exclusive jurisdiction, civil and military, over the counties where all the parties to this suit resided, and where the property of his testatrix was; that Confederate treasury notes were almost the exclusive currency in those counties, and that under these circumstancs, and because to refuse it would have rendered himself inimical to the power regnant, and subjected him to great risk and danger, he collected the said loan in Confederate treasury notes, put them out at interest, and when he could no longer lend them to individuals, he lent the amount to the States then confederated in armed hostility to the United States, and received from the officers of the so-called Confederate Government a certificate for this sum. The court will observe that the circumstances under and in consequence of which this money was first converted into worthless and

vicious currency, Confederate treasury notes, are set forth in a somewhat loose and very general manner. It is not even alleged that the then ruling power had declared those notes a legal tender, or in any way, by any act, compelled creditors to take them in payment of debts, and the facts set forth certainly are not sufficient to constitute duress, nor is this claimed by the appellant. And in the case of *Botts* vs. *Crenshaw*, which arose at Richmond, the very seat and centre of the rebellion, it was held by the United States circuit court for the fourth circuit and district of Virginia, the chief justice of the United States himself presiding, that an attorney who had, under what were considered justifying circumstances, collected a debt, due a client, in a Confederate currency, was bound after the war to account for and pay to that client the amount of that debt; nor did the further fact, that he had, under similar circumstances, invested this Confederate currency, thus collected, in Confederate bonds, lessen his liability or absolve him from accounting to his client. And in the case of *Shortridge* vs. *Macon*, decided by the circuit court of the United States for the district of North Carolina, the same judge presiding, it was held that compulsory payment to a receiver, under an order of a court of the Confederate States, of a debt due to a citizen of Pennsylvania did not excuse the debtor from the duty of paying the same afterwards to the original creditor—though in this case, unlike the one at bar, where there was no such compelling force used, the compulsion, being in the form of an order of the court of the government, which then exercised exclusive jurisdiction, might not unreasonably, perhaps, have been deemed duress. And, in this connection, the appellees refer also to the reasoning of the supreme court in the case of *Texas* vs. *White*, 7 Wallace, 733.

The defendant relies greatly upon the fact, that in this whole matter, in collecting the money and then lending it to the government in rebellion against the United States, thus aiding it to effect its object—the overthrow of the national government—he acted with the best intentions, under legal advice, and as the most prudent man would have acted under similar circumstances; possibly all this may be true; certainly, for the purposes of this argument and to sus-

tain the correctness of the decision of the court below, it is unnecessary to call in question either the prudence or good faith of the executor, under the circumstances by which he was surrounded, for the question still recurs and must be answered, whether the investment, being made in a loan to an organization formed for the purpose of overthrowing the union of the States under the constitution, is one which can, under any circumstances, be recognized in the courts of this State as excusing the executor from accounting, for the funds in his hands, to the legatees who are entitled thereto; and this cannot be an open question, for in the case of *Head and als.* vs. *Talley, Administrator, &c.*, a case in every respect identical and parallel with this case, heard and decided by the United States circuit court for the district of Virginia, Chief Justice Chase presiding and delivering the opinion of the court, it was held " that whatever may have been the motive inducing such an investment, however it may have been warranted by example or even by judicial authority, itself involved in the general rebellion, it is impossible that it should receive the sanction of a court of the United States;" and it was further held " that such an investment was inoperative as a discharge from responsibility to the complainants " who were there, distributees.

The appellees rely upon this case as perfectly conclusive of the case at bar, and ask upon its authority, as well as upon the facts and law involved, that the decision of the court below be affirmed.

BERKSHIRE, P. This case, it appears, was heard on the bill, answer and *demurrer* thereto, and exhibits. The demurrer was sustained and a decree rendered upon it, against the appellant; from which decree he has appealed. It is evident that the object of the pleader, in attempting to raise an issue in this novel way, was, to deny the appellant's right to relief, on the premises, upon *his own showing.* But a demurrer to an answer is unknown in chancery practice, and must therefore be regarded as surplusage; and the case is to be considered here, without regard to the demurrer, and as if it had been heard on the bill, answer *without replication,* and exhibits. And being so considered, the answer must be taken

as true, and thus the purpose of the appellant, in tendering his demurrer, will be accomplished. The question, then, in the case is, whether the appellant has shown himself entitled to relief under the averments of his answer.

On his behalf it was ably maintained that, inasmuch as he acted in the utmost good faith in the premises and under the advice of counsel, he ought, under the extraordinary condition of the country, and the very peculiar circumstances which surrounded him at the time, to be exonerated in a court of conscience from liability.

It certainly cannot be denied that courts of equity have always manifested much indulgence and liberality toward executors and other trustees, who have acted prudently and in good faith, in the management of the funds under their control; and many cases may be found where relief has been granted against losses resulting from causes which could not be anticipated or foreseen or guarded against by ordinary foresight and diligence. But in the present case, I think the appellant, for two reasons, has failed, under the averments of his answer, to show himself entitled to the relief asked. The first is, because it is not explicitly averred in the answer (or does it otherwise appear) that he was compelled to receive the fund in controversy by the coercion of the *debtor*, to whom it had been previously loaned. And if not *so* coerced, this court has repeatedly held that a payment thus made is not a *valid* payment, and that the debtor might be compelled to pay the debt again, and there being no averment of the insolvency of the debtor, nor that the debt might not have been collected from him, by the use of proper diligence, notwithstanding such pretended payments, no ground for relief in this respect is shown. The second is, that the loan of the fund to the so-called Confederate Government, if conceded, as claimed, to have been made in good faith (if, in a legal sense, it could be so), was, *per se*, wholly *illegal*, and tending directly to aid the Confederate authorities in their effort to subvert the government of the United States. And the books furnish no instance, where a trustee or other fiduciary has been excused or exonerated from liability or loss resulting from their own acts, which were in themselves not only illegal, but in contravention of the public policy of the government.

In such a case, no court, organized under such government, could sanction such acts, by granting relief against the loss occasioned by them. Other objections to the decree have been suggested here (I presume) for the first time.

The first is, that the decree should not have been against the appellant personally, but only *de bonis testatoris*. There can be nothing in this objection. No such question was raised in the court below. But it was admitted that the amount of the legacy remained in the hands of the executor after the payment of the debts against the estate; and he claimed relief against the payment of it *only* because of the loss of the funds, occasioned by the late rebellion.

The second objection is, that the debt and interest was aggregated and interest given from a certain day, when the legacy to the appellees was not to be had until after the death of Mrs. William C. Bowyer. The bill alleges that said Bowyer died on the 2d of January, 1864. In the appellant's answer to the bill, he says that he offered to pay over the legacy to the appellees, in Confederate money (which they refused to receive), soon after the death of said Bowyer; and that afterwards, under the advice of counsel, he invested the funds in Confederate bonds, by depositing the same with John Withrow, a depository of the Confederate government, and took his certificate of deposit therefor, which is filed as an exhibit of the answer. This certificate bears date on the 24th of March, 1864, and I think, therefore, we ought not to assume here that the circuit court erred in giving interest from the 2d of January previous.

The remaining objection is, that it was an error to decree against the appellant without requiring the appellees to execute to him a refunding bond before he should be compelled to pay over the money.

It appears that the appellant qualified as executor under the will of Malinda A. Bowyer in 1854, and that his accounts were finally settled before a commissioner, in 1860, ten years before the commencement of this suit, and that the amount of this legacy and much more was then in his hands, and the amount of said legacy so remained; and there has been no suggestion of any debts existing against the estate of the testator, nor want of assets to pay the legacy in contro-

versy, and I think, under the state of facts appearing in the record, the court did not err in decreeing against the appellant without requiring such bond.

I can see no error in the decree complained of, and think it ought to be affirmed with costs and damages.

The other judges concurred.

DECREE AFFIRMED.