# Wheeling.

## McClure Adm'r v. Johnson et al.

### Decided December 14, 1878.

1878
Special Term.

1. The county of Pendleton being under the control of the government of Virginia, at Richmond, a commissioner of the county court of that county acting under this Richmond government settles during the war an *ex parté* guardian account. HELD :
   Such *ex parte* settlement is as valid as though it had been made prior to the war, and must be regarded as *prima facie* correct, but subject to be surcharged and falsified.

2. A guardian in Pendleton county collects a part of a debt due his ward in February, 1861, and the residue of this debt he collects in February, 1862, in bank notes very little, if at all depreciated at that time. The debt so collected was perfectly solvent. The bank notes so received are not kept in kind by the guardian, and such bank notes are at the close of the war not worth more than forty cents on a dollar. The guardian claims, that he could not safely lend out this money during the war, and he ought not to be charged with interest on it during the war, nor with more than 40 per cent of the principal at the close of the war ; but he fails to prove satisfactorily, that by the use of diligence he could not have loaned this money out, though he does prove that it was difficult to lend out money during the war. He had invested this amount of Confederate notes in September, 1863, in Confederate bonds in his name as guardian, Confederate notes being then worth not more than one-tenth of their nominal value. HELD :
   Under the act of the Virginia Legislature at Richmond, passed March 5, 1863, a circuit court was not authorized to approve such investment ; and on the general principles of a court of equity such an investement ought not to be upheld ; and the guardian ought to be charged with the full amount received by him with interest from

the time it was received. *Quære.* Can an investment in Confederate bonds by a fiduciary be upheld under any circumstances ?

1878
Special Term.

McClure, Adm'r
v.
Johnson *et al.*

Appeal from a decree of the circuit court of Pendleton county, rendered on the 18th day of November, 1871, in a cause in said court then pending, in which John Mc-Clure, administrator of William M. McClure, was plaintiff, and Jacob F. Johnson and others were defendants, awarded on the petition of said Johnson.

Hon. J. T. Hoke, late judge of the fourth judicial circuit, rendered the decree appealed from.

GREEN, PRESIDENT, furnishes the following statement of the case :

In May, 1868, John McClure, administrator of Wm. M. McClure, filed his bill in the circuit court of Pendleton county, setting forth that the defendant, Jacob F. Johnson, was appointed the guardian of his intestate by the county court of Pendleton county on February 3, 1859, and that his co-defendants, Benjamin Hiner and John E. Wilson, were his sureties in his guardian bond; that Wm. M. McClure, the ward, died June 16, 1864, aged eighteen years ; and that his guardian, Jacob F. Johnson, had never made a legal and valid settlement of his guardian accounts, but that he insisted, that a supposed settlement, made by him in 1864 before a commissioner of a court then organized in the county of Pendleton under the authority of the pretended government of the Confederate States, was good and valid; and that the balance found due on said supposed settlement should be discharged wholly, or partially, by the delivery to the administrator of his ward of a bond of said Confederate government so called. Which positions of this guardian the bill controverts. The bill prays, that the guardianship account of Jacob F. Johnson may be settled, and the balance found due from him may be decreed to be paid to the plaintiff, the administrator of the ward, by the defend-

ants, the guardian and his securities; and for general relief. An amended bill was afterwards filed but it in no manner varied the character of this suit.

In September, 1861, Jacob F. Johnson filed his answer to this bill and amended bill. He admits his appointment as guardian and his giving this bond as alleged in the bill. He states, that most of his ward's estate consisted of a legacy given him by the will of Martin Judy; that he had much difficulty in getting a settlement with the executor of Judy; but eventually did so, when the amount coming to his ward was found to be $677.06½ with interest from July 13, 1860; that in February, 1861, a part of this amount was paid to him and the residue thereof, being the greater part thereof, in February, 1862; that he was unable safely to lend out this money, which had been paid in bank notes, though he endeavored to do so; that at one time he had the promise of a responsible party to take this money, but he afterwards declined to do so; that he would have preferred not to receive this money, if he could have properly declined it, but it was brought to his house in his absence. And he insists, that he ought not to be charged with the interest on this money nor with the amount of these bank notes received during the war in 1862, but as they became afterwards worthless in part he should, if responsible at all, be held responsible for only the actual value of these bank notes at the close of the war.

He states, that he made a settlement with a commissioner in 1860, in which the balance against him was $48.01, which settlement cannot now be found. On October 2, 1864, he made his second settlement before commissioner John M. Jones, which was duly admitted to record, and an attested copy of it is filed with his answer. In it he is charged with the balance due on first settlement by cash received of A. Judy, executor of Martin Judy, February 8, 1861, $268.09; with amount received November 3, 1861, of D. G. McClung $19.11; with amount received of A. Judy by hands of P. Phares,

February 6, 1862, $477.00; with amount of rents received March 15, 1864, $68.35; and with amount received of Lewis Mayers, $37.93, on August 24, 1864. And he is credited with various small sums paid out: with $5.00 services rendered in renting farm, and $53.05, commissions on receipt of guardian, which commission was five per cent on the principal received by him, and the interest on this principal up to the time of the settlement. Among the sums paid, which are allowed as credits, is $60.00 for an overcoat and cape furnished his· ward in 1864. The entire amount of credits allowed was $286.58. The interest on these credits and also on the charges is calculated to October 2, 1864, and the balance is struck showing the amount due the ward, $627.41 of principal, and $121.28 interest.

To this account the commissioner appends this report, in which he says : " The guardian reports to the undersigned, that owing to the existing war he was unable to loan or invest the funds as they came into his hands, as the law requires; therefore the undersigned has deemed it proper to charge the said guardian with simple interest agreeable to the within account."

This answer then states, that his ward was in the Confederate army influenced by the example and advise of his elder brother, the plaintiff in this cause ; that the government at Richmond had the control of Pendleton county during the war; that neither the restored government of Virginia nor the government of West Virginia had any officers in that county; that under these circumstances he invested, pursuant to a law passed by the government of Virginia at Richmond, March 5, 1863, with the approval of Judge Allen, the moneys in his hands, as such guardian, in a Confederate bond of $700.00 dated September 9, 1863, and payable to him, guardian of Wm. M. McClure, or his assigns, and bearing 7 per cent per annum interest, which investment, he alleges, was approved by the judge of the circuit court of Pendleton county acting under the Richmond government; and he files

with his answer his petition to this court and the action of the judge thereon.

This petition states, that prior to March 5, 1863, he had received and had on hand a sum of money belonging to his ward, which with interest to September 1, 1864, would amount to $750.00, which amount he collected and received in the due exercise of his trust, and which money he was unable to lend out in good hands or pay to his ward, owing principally to the war; that on July 31, 1863, he invested this money in a Confederate States bond bearing 7 per cent interest; that he received this money of Martin Judy's executor, most of it on February 6, 1862, in bank notes, principally on southern banks; and that after using due diligence to loan out the same he was unable to do so, and therefore made this investment; and he asks the court to grant leave to this investment, so that he may be relieved from responsibility.

This petition was filed August 31, 1864; and on September 5, 1864, it was acted on in vacation by Judge J. W. F. Allen, the judge of the twelfth judicial circuit of Virginia, who on this petition ordered, that said fiduciary have authority to invest said moneys in 7 per cent bonds of the Confederate States, which he is directed to hold for the purpose of the trust; and he was directed to report, whether the bond he had obtained was a registered or unregistered bond, in whose name it was, its date, number and precise cost; and it was expressly added to this order, that it was not to be considered as releasing said fiduciary from any liability arising from the receipt of funds deemed more valuable than Confederate notes, and which were not applied at their current rates in the acquisition of said bond; and if these bank notes were still in the possession of the fiduciary, he was authorized to invest the same for 8 per cent. Confederate bonds at current rates for each, making report to the next term of the court.

This order was directed to be entered on the chancery order book of the circuit court of Pendleton county and it was so done accordingly.

To this answer the plaintiff filed a special replication, in which he says, that A. Judy was abundantly able to pay what he owed his intestate, the ward of defendant Johnson; and there was no necessity or propriety in his receiving depreciated bank paper for a perfectly good debt. He charges, that the defendant Johnson was an active supporter of the Confederate government, and therefore ought to have no advantage of the past; that the State of West Virginia had no officers in Pendleton county during the war. And he charges that the investment made in a Confederate bond was made to promote not his ward's interest but to aid the Confederate government; and that the investment was illegal and not binding on his ward. He alleges, that there were pretended rebel officers of the courts in Pendleton county during the whole war acting under the so-called Confederate government, before whom said guardian might have settled his acount; but he never did so till October 24, 1864; and this settlement was not recorded till May 1, 1865, after the war had virtually ended and the Confederate government, Confederate money and Confederate bonds had expired.

1878
Special Term.

McClure, Adm'r
v.
Jennson et al.

In September, 1869, the court ordered Jacob F. Johnson to render an account of his actions and doings as guardian before a master commissioner, taking in the decree no account of the *ex parte* settlement of commissioner Jones. On March 11, 1870, he made his report. It is composed of the same items as the *ex parte* settlement of commissioner Jones, but is differently stated; and the commissioner reports, that the plaintiff objected to the allowance of $60.00 for overcoat and cape furnished ward in 1864 as extravagant and unreasonable, and that the defendant asked the commissioner to report that at the death of the ward he, the guardian, had in his hands sundry bonds and notes for rent belonging to his ward's estate amounting of principal to $607.27, which he had turned over to the complainant on December 13, 1866; and on which he claimed he was enti-

tled to a commission. The balance due from the guardian was reported to be on March 1, 1870, $763.20 of principal and $230.40 of interest, total $993.60.

Various exceptions were filed by the defendant to this report; but as only one of them was acted on by the court, it is unnecessary here to notice them.

The cause was recommitted to a commissioner April 22, 1870. The only instruction given the commissioner in this decree was to close the guardian's account at the death of the ward, all other exceptions being unacted upon.

. On September 7, 1870, commissioner Blakemore made his report, in which the same items are embraced as in the two previous reports. The balance found by his report as due from the defendant, Johnson, is $1,014.02 with interest on $738.37 from September 7, 1870, which result is almost identical with that found by commissioner Masters. .Various exceptions were filed by the defendant to this report; and two special statements were made by the commissioner based on the defendant's views of the law which should be·the basis of the report. In one of these no interest is charged on moneys in the hands of the guardian after the war commenced, but interest is allowed him on sums paid out, and credit is given by the Confederate bond of $700.00. This mode of settlement would bring the ward in his debt $8.46. The other statement charges no interest on either side during the war, and does not allow the credit of the $700.00 Confederate bond, the balance found due the ward is $610.69, as of June 1, 1865; and as this was in depreciated bank notes, not worth over forty cents on the dollar at the close of the war. It is claimed that the guardian should be charged with forty per cent. only of that sum, that is $247.87 with interest from June 1, 1865. To this report of commissioner Blakemore the defendant filed numerous exceptions not necessary to be noticed; and on September 17, 1870, the court rendered the following decree:

1878
Special Term.

McClure, Adm'r
v.
Johnson et al.

"The cause came on this day to be heard upon the papers formerly read herein and the report of commissioner George A. Blakemore, to which there are exceptions, and was argued by counsel; upon consideration whereof, the court overrules all the exceptions to said report, and the said report is hereby confirmed; and thereupon the court doth decree, that the said John McClure, administrator of William McClure, deceased, recover of the said Jacob F. Johnson, Benjamin Hiner and John E. Wilson, the sum of $1,014.02, with interest thereon from the 17th day of September, 1870, until paid, and the costs of this suit, including an attorney's fee of $30.00; but execution is not to issue hereunder till the 12th day of November, 1870; and leave is given the defendant to take any further depositions in the cause before the said 12th day of November, 1870, to be read herein; and if the defendants take any further depositions, the plaintiff has the privilege to do likewise."

The evidence taken in the case shows, that on February 8, 1861, Judy's executor had a settlement with the defendant Johnson, the guardian; and it was ascertained he owed the guardian as such $718.00, which he settled by paying to the guardian $260.09 in cash and giving his note for the balance. In the fall of 1861 Judy offered to pay $200.00 on this note, but Johnson, the guardian, declined to receive it, unless the whole amount due was paid. On February 6, 1862, about one year after this settlement Phares on behalf of Judy went to the house of Johnson, the guardian, prepared to pay off his note, which then amounted to $477.00. The family declined to receive it in the absence of Johnson. But on consultation with a brother of the guardian it was concluded to accept the payment; and the $477.00 was paid in Virginia and southern bank notes, which the guardian, Johnson, when he returned home received, making no objection at any time to the funds in which it had been paid, being the best currency then in circulation in Pendleton county.

The county was then under the control of the government of Virginia at Richmond and the Confederate government, and continued so during the war, except that portions of it were at times held by a West Virginia military organization and by Federal forces; but neither the restored government of Virginia nor the State of West Virginia had any civil officers in the county; and the courts were irregularly held during the war by officers under the government of Virginia at Richmond. The condition of the county was such, that the courts held in the county were frequently not held at the court house, but in a remote part of the county. The value of the Virginia and southern bank notes on February 6, 1862, when Johnson, the guardian, received them was in Richmond about 95 per cent. as compared with gold, and they were at par as compared with greenbacks. Before the close of the war these Virginia and southern bank notes depreciated to probably less than 40 per cent. as compared with gold.

It was difficult to lend money in Pendleton county during the war. Johnson, the guardian, at a time not stated by him but probably shortly after this $477.00 was paid to him in bank notes, offered to lend it to one person, who hesitated about borrowing it and finally declined to do so. There is no evidence that Johnson ever made any other effort to lend out this money, and while it was difficult to lend out money there, still some money was loaned out during the war in Pendleton county, though as a general thing money to be loaned was in the county invested in Confederate States' bonds.

After some time not stated by Johnson, probably shortly after the receipt of this $477.00 in bank notes; he proposed to deposit a portion of it in the bank at Harrisonburg, but they declined to receive $200.00 of these bank notes, and Johnson then changed it into Confederate notes and they accepted it as a deposit. There is no evidence to show what use, if any, Johnson made of $477.00. On September 9, 1863, he invested $750.00 of

Confederate notes in a 7 per cent. Confederate bond payable to him as guardian of William M. McClure; and on September 5, 1864, he obtained the order of Judge Allen before stated. On November 18, 1871, the court rendered a decree setting aside the decree of September 17, 1870, "and that the plaintiff recover of the defendants the sum of $875.14 with interest thereon from this date and costs of this suit, including attorney's fee of $30.00."

From this decree an appeal has been taken by the defendant, Jacob F. Johnson, to this Court.

*Charles J. Faulkner,* for appellant, cited the following authorities:

4 Munf. 370; Code Va., ch. 132, §23; 12 Leigh 142; 4 H. & M. 255; Ordinances of W. Va. Convention, Constitution and Statutes Schedule, Ordinance of 18th February, 1863, pp. 23, 32; 22 Gratt. 682; Acts 1872-3, ch. 98; 8 Wall. 11, 12; 21 Gratt. 196; 9 Gratt. 557; 21 Gratt. 754.

*Joseph Sprigg and James C. Baker, Jr.,* for appellant, relied on the following authorities:

Story on Con. §703; 5 Pet. 372; 18 Pet. 187; 24 Wis. 518; 1 How. 104; 1 Call 205; 4 Leigh 209; 5 Gratt. 411; 4 Gratt. 43; 1 How. 311; 2 How. 608; 4 Johns. Ch. 619; 9 Gratt. 541; 5 How. 233; 21 Gratt. 194; *Id.* 733; 11 Gratt. 792; 1 Burr. 452; 10 Wheat. 333; 21 Gratt 251; 22 Gratt. 424; 8 Wall. 603; 12 Wall. 457; 8 Wall. 1; 4 W. Va. 142; 4 W. Va. 234; 11 Wall. 259; 14 Wall. 663; 6 Wall. 1; 7 Wall. 700; 14 Wall. 238; 20 Gratt. 31; *Id.* 408; 21 Gratt. 300; 19 Gratt. 402, 431; 22 Gratt. 409; *Id.* 628.

*W. H. H. Flick,* for appellee, cited the following authorities:

26 Gratt. 627; 25 Gratt. 410, 420, 421; 24 Gratt. 101; 25 Gratt. 701; *Id.* 507; 27 Gratt. 270, 278; Whart. on

1878
Special Term.

McClure, Adm'r
v.
Johnson et al.

Neg. §522 ; 28 Gratt. 479, 481 ; 26 Gratt. 298 ; *Id.* 496 ; 28 Gratt. 366 ; 26 Gratt. 621, 627 ; 28 Gratt. 481 ; 25 Gratt. 425, 518, 521, 528, 534; 2 Lom. Ex. 293 ; 26 Gratt. 496 ; 28 Gratt. 153 ; Story Eq. Jur. §1,270 ; 15 Wall. 343 ; Whart. Neg. §524 ; Story Eq. Jur. §§1,328, 1,330, 1,339, 1,353, 1,356, 1,357 ; 1 Rob. 212, 213; 23 Gratt. 670; 22 Gratt. 313 ; 11 W. Va. 412, 413 ; 7 Wall. 447 ; 5 W. Va. 264 ; 17 Wall. 581 ; Code Va., ch. 35, §10 ; 1 Rob. 196; 17 Wall. 22 ; 22 Gratt. 682; 17 Wall. 570; Code W. Va. ch. 131, §16; Cool. Const. Lim. 285, 288 ; 4 W. Va. 703 ; 22 Gratt. 1 ; *Id.* 672, 673 ; 6 Leigh 271 ; 1 Gratt. 11 ; 3 Gratt. 115 ; Code Va., p. 602, §8 ; *Id.* p. 588, §8 ; 11 Leigh 439 ; 3 Leigh 25 ; 1 Gratt. 143, 150 ; 2 Rob. (old) Prac. 378 ; *Id* 383 ; 5 Gratt. 412 ; 24 Gratt. 101 ; 25 Gratt. 701 ; *Id.* 410; *Id.* 507 ; 26 Gratt. 476 ; *Id.* 300 ; *Id.* 621 ; 1 Rob. 212, 213, 221.

GREEN, PRESIDENT, delivered the opinion of the Court :

The first enquiry presented by this record is, whether the account of Jacob F. Johnson, guardian of Wm. M. McClure, settled on October 2, 1864, by John M. Jones, a commissioner of the county court of Pendleton, and the reports of this commissioner are to be regarded as mere nullities, because, when it was made, Jones was a commissioner of a county court, which recognized the authority of the government of Virginia, at Richmond, which co-operated with the Confederate government, and because this commissioner did not recognize the authority of the restored government of Virginia or the government of the United States.

The county of Pendleton was then under the control of the civil government of Virginia, at Richmond, and of Confederate civil officers. The restored government of Virginia and the government of the United States had no civil officers in that county during the war. The Confederate military authorities had also generally control over that county during the war, the Federal mili-

tary authorities controlling small portions of the county only for a portion of the time, while the war was pending. The courts were held in the county at irregular intervals of time during the war by the judges and justices, who recognized the authority of the government of Virginia at Richmond. While no courts, which recognized the authority of the restored government of Virginia or the government of West Virginia or the Federal government of the United States, were held during the war in this county. In other words the county of Pendleton was during the war *de facto* under the control of the government of Virginia at Richmond.

Upon this state of facts there can be no doubt, that the settlement of commissioner Jones, made in pursuance of the laws of the government of Virginia at Richmond, was valid and effectual to the extent, that these laws made it valid. See *Texas* v. *White*, 7 Wall. 702.

The Supreme Court of the United States in the case of *Horn* v. *Lockhart*, 17 Wall. 580, say: "We admit, that the acts of the several states in their individual capacities and of their different departments of government, executive, judicial and legislative, during the war so far as they did not impair, or tend to impair, the supremacy of the National authority or the just rights of citizens under the Constitution, are in general to be treated as valid and binding. The existence of a state of insurrection and war did not loose the bonds of society, or do away with civil government, or the regular administration of laws. Order was to be preserved, police regulations maintained, crime prosecuted, property protected, contracts enforced, marriages celebrated, *estates settled*, and the transfer and descent of property regulated precisely as in time of peace. No one that we are aware of seriously questions the validity of *judicial* or legislative acts in the insurrectionary States touching these and kindred subjects when they were not hostile in their purpose or mode of enforcement to the authority of the National

1878
Special Term.

McClure, Adm'r
v.
Johnson et al.
government, and did not impair the rights of citizens. The validity of the action of the probate court of Alabama in the present case in the settlement of the accounts of the executor we do not question, except so far as it approves the investment of funds received by him in Confederate bonds, and directs the payment to the legatees of their distributive shares in those bonds."

It is clear, on this reasoning, that the government of Virginia at Richmond, being held to be a *de facto* government, can in no manner affect the validity of a settlement made by a commissioner of one of her courts in a county, which was *de facto* subject to her jurisdiction.

This settlement was not of course hostile to the authority of the National government, nor did it in any way impair the rights of any citizen under the Constitution. Its validity cannot therefore be questioned. The wonder is that it ever should have been questioned.

The true position is thus laid down by Judge Robertson in *Hildreth's heirs* v. *McIntire's devisee*, 1 Mar. J. J. (Ky.) 206, who says: "When the government is entirely revolutionized, and all its departments usurped by force, or the voice of a majority, then prudence recommends and necessity enforces obedience to the authority of those who may act as public functionaries; and in such a case the acts of a *de facto* judiciary and a *de facto* Legislature must be recognized as valid. This is required by political necessity. There is no government in action, excepting the government *de facto*; because all the attributes of sovereignty have by usurpation been transferred from those, who had been legally invested with them, who sustained by a power above the forms of law claim to act, and do act, in their stead."

It is true these positions so obviously necessary and just are inconsistent in principle with certain decisions in this State, as *Brown* v. *Wylie*, 2 W. Va. 502; *Calfee's adm'r* v. *Burgess*, 3 W. Va. 274; but these decisions have been overruled since, and the true position as above stated sustained, as it is fully by authority, is now estab-

lished in this State. See *Harrison* v. *Farmers' Bank of* <sub>1878</sub>
*Va.*, 6 W. Va. 1; *Henning* v. *Fisher*, 6 W. Va. 238;
*Clay* v. *Robinson*, 7 W. Va. 348; *Smith* v. *Henning*, 10
W. Va. 628.

There was much testimony taken in the case before us by the plaintiff to prove that the defendant, Johnson, was an active supporter of the Confederate government, which was attempted to be off-set by evidence, showing that the plaintiff was also a sympathizer and supporter of the Confederate government. All this evidence was of course entirely foreign to the issue in the case. The parties to the suit seemed to have assumed that the case was not to be decided upon its merits, but the decision of the court was to be greatly influenced, if not absolutely controlled, by the political sentiment and conduct of the parties. This assumption was very uncomplimentary to the court.

I conclude therefore, that the *ex parte* settlement made before commissioner Jones, on October 2, 1864, was entitled to precisely the same weight as though it had been made prior to the war.

The next enquiry is: Was the investment made in the name of J. F. Johnson, guardian of Wm. M. McClure, in a Confederate bond, of September 9, 1863, an investment by him as guardian, which should be upheld as such by the court, and he be permitted to apply this bond to the payment of any amount he may be found indebted to his ward?

It is claimed, that this investment was made in pursuance of an authority conferred by the government of Virginia, at Richmond, by an act of the Legislature, and that it was pursuant to this act approved by J. W. F. Allen, the judge of that circuit, by his order dated September 5, 1864. If this were so, according to the decision of *Horn* v. *Lockhart et al.*, 17 Wall. 570 before referred to, such an investment would have been an illegal transaction, though it had been approved in the manner prescribed by the law by Judge Allen. By this decision the court, while admitting generally the val-

Special Term.<br>McClure, Adm'r<br>v.<br>Johnson et al.

idity of the judicial acts of a *de facto* State such as the State of Virginia as represented by the Richmond government, except such acts as were in direct aid of the rebellion hold, that such an investment was a direct contribution to the resources of the Confederate government, and though approved by a court of probate in the manner prescribed by law, it was nevertheless invalid.

But in *Thorington* v. *Smith*, 8 Wall. 1, it was decided, that a contract for the payment of Confederate treasury notes, made in the usual course of business between parties residing within the Confederate States, was a valid contract and would be enforced. The court says : "It cannot be questioned, that Confederate notes were issued in furtherance of an unlawful attempt to overthrow the government of the United States by insurrectionary force. Nor is it a doubtful principle of law, that no contracts made in aid of such an attempt can be enforced through the courts of the country whose government is assailed." But after an elaborate consideration of the question the court concludes : "That contracts stipulating for the payment of Confederate notes cannot for that reason only be regarded as made in aid of the domestic insurrection. They have no necessary relation to the hostile insurgent government. They are transactions in the ordinary course of civil society, and though they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to be entered into to further insurrection. We cannot doubt, that such contracts should be enforced in the courts of the United States after the restoration of peace to the extent of their just obligation." This case was followed in *Harrison* v. *Farmers' Bank*, 6 W. Va. 1.

The investment of funds in Confederate bonds by fiduciaries, when properly made, have on the contrary been frequently held by the Court of Appeals of Virginia to be a valid transaction, which would under proper circumstances be sustained by the court : such an investment being regarded by the court evidently as a mere business

transaction, like a contract to pay Confederate notes, and as not necessarily intended to aid the Confederate government. See *Davis* v. *Harman*, 21 Gratt. 199; *Fugate* v. *Honaker's ex'r et al.*, 22 Gratt. 412; *Myers* v. *Zetlle*, and *Spriggin's committee* v. *Zetelle*, 21 Gratt. 733; *Mills et al.* v. *Mill's ex'r et al.*, and *Same* v. *Lancaster et al.*, 28 Gratt. 442.

In these and numerous other cases the Court of Appeals of Virginia has had under its consideration the propriety of an investment made by a fiduciary of funds in his hands in Confederate bonds; and in all cases the court has approved or condemned such investment according as it had been made pursuant to the laws of the State of Virginia under the Richmond government, or was made under circumstances that, upon the principle of a court of equity as applied to fiduciaries, would have justified them, or otherwise. And it is obvious, that in no case have they considered, that such an investment was in aid of the rebellion and therefore not to be sustained. They treat an investment in a Confederate bond by a fiduciary as a business transaction, to be approved, or condemned, upon the same principles as any other investment.

In this State in the case of *Copeland's ex'r* v. *McCue et al.*, 5 W. Va. 264, it was expressly decided, that an investment by a fiduciary under any circumstances of funds in his hands in Confederate bonds was *per se* wholly illegal, as tending directly to aid the Confederate authorities in their effort to subvert the government of the United States. But since the rendition of this decision this Court has adopted a much more just and liberal view of all business transactions occuring during the war in the section of country, then under control of the *de facto* government of Virginia, at Richmond, than that acted upon by our courts formerly. As an example of which I may refer to the case of *Harrison* v. *The Farmers' Bank of Virginia*, 6 W. Va. 1, in which this court decided, that a contract made in such section of country during the war, though payable in Confeder-

ate notes, would be enforced, overruling decisions formerly rendered by this court in *Brown* v. *Wylie*, 2 W. Va. 502 and *Calfee's adm'r* v. *Burgess*, 3 W. Va. 274.

Whether the decision of *Copeland's ex'r* v. *McCue*, 5 W. Va. 264, or the Virginia decisions above cited should be followed, need not to be decided in this case. For though we were to regard the law laid down in the Virginia cases as correct, still it is obvious, that in the case before us the investment made by Jacob F. Johnson in the Confederate bond of $750.00 ought not under the circumstances of this case to relieve him from responsibility for the amount, which may be due his ward; and this bond ought not to be directed by the court to be received in payment of this balance. It is of course utterly worthless; and the loss, which resulted from the making of this investment, under the circumstances ought to fall upon Johnson, on the principles laid down in the Virginia cases. It was not an investment of his ward's funds, but an attempt to satisfy a previous indebtedness of the guardian by an investment in a bond, which was worth, when the investment was made, far less than its face value. This investment was made without the authority of the court or judge, and when called to the attention of the judge by the *ex parte* petition of Jacob F. Johnson, so far from its being approved by the judge, as is claimed, it was, as we understand the order of the judge, expressly disapproved.

It was expressly decided in *Crickard's ex'r* v. *Crickard's legatees*, 25 Gratt. 410, that to authorize an investment by a fiduciary under the order of a judge, in Confederate bonds, the act of the Virginia Legislature of March 5, 1863, required, that these three conditions should concur: "1st. The money must be in the hands of the fiduciary. 2d. It must have been received in the due exercise of his trust. 3d. For some cause he must be unable to pay it over to the party entitled. And if they do not all exist, the order of the court or judge is null and the fiduciary is responsible for the money."

Now it is obvious, that when the guardian in this case on August 31, 1864, filed his petition under this act, the first of these necessary conditions did not exist. The money received by him as fiduciary, had a portion of it been received in the equivalent of gold, before the commencement of the war, and the balance shortly after the war commenced, on February 6, 1862. This he received in bank notes very slightly depreciated. All of this money he had probably used, and certainly he had kept none of it on hand in kind; and more than nineteen months after the last payment to him, and thirty-one months after the first payment, he invests in a Confederate bond, not this money which he had received, but Confederate notes of an equal amount, but then not worth one-tenth of the value of the bank notes when received by the guardian. This investment was made without the leave of the court, and was not an investment of trust money in his hands. And when he filed his petition under the act of March 5, 1863, which he did not do for nearly a year after he made this investment, he did not in his petition pretend to allege, that he had in his hands the same funds, which he had collected as guardian, though he does say, that he had invested said money in this Confederate bond. This was true in one sense, that is, he had invested this amount of Confederate notes, but not the bank notes he had received.

The court accordingly in its order does not approve the investment which had been made, but says: "It appearing from said petition that the major part of said funds was received in bank notes, and it not being shown that they were used in making said investment, or that the enhanced value, they were deemed to have in July, 1863 (when the petition states that the investment had been made) and subsequently, was passed to the ward, which would be proper and necessary, this order is not to be construed as releasing said fiduciary from any liability from the receipt of funds deemed more valuable, and which are not applied at current rates in the acquisi-

tion of said bonds; and if said bank notes are still in the possession of said fiduciary, he is hereby authorized to invest the same in seven or eight per cent Confederate bonds at current rates for each, making report to the next term of the court."

This order was made September 5, 1864. The guardian was doubtless dissatisfied with it, as he never did under it make any investment in Confederate bonds, or make any report to the court at its next term or at any other time. But he appears after the making of this order to have abandoned entirely his proceedings. The previous part of this order had not approved the investment already made, but had directed the fiduciary to report the exact character of the investment, which had been made, and only gave him authority thereafter to invest in seven per cent bonds of the Confederate States, an authority which he did not choose to avail himself of on the terms required by the court, which he doubtless deemed unreasonable; and therefore he abandoned the proceeding. Accordingly in his *ex parte* settlement, made before commissioner Jones in less than a month after this order of Judge Allen, he does not report this Confederate bond as a part of the assets of his ward in his hands, but on the contrary does report the funds collected of A. Judy, in person and through Phares, as funds wherewith he was to be charged, and it was accordingly so charged. It would seem therefore clear and be-
Syllabus 2.   yond reasonable controversy, that this Confederate bond was not, when this settlement was made by the guardian, regarded by him as assets of his ward in his hands; and there can be no pretense, that this investment was made under the authority of the act of March 5, 1863.

Nor can it be sustained as a proper investment, binding on the ward, upon the general principles of a court of equity. The investment was made in a bond not worth one-tenth part of its face value, at the time the investment was made. It was not depreciated funds of the ward, which had been collected by the guardian, that

was invested in this greatly depreciated bond ; but the investment was made to satisfy an indebtedness of the guardian, a portion of which arose before the war, and the balance from the receipts of bank notes in the early part of the war in payment of a perfectly safe ante-war debt. These bank notes, when received, were very slightly, if at all, depreciated.

The propriety of this investment is urged, on the ground that these funds, which had been received in bank notes before and shortly after the commencement of the war, could not be loaned out safely by the guardian ; and after remaining in his hands idle for more than eighteen months, and constantly depreciating in value, he was justified in investing them in this bond, which though greatly depreciated, was nevertheless bearing interest. But the facts proven in the case do not sustain this position, even if it would have been in itself a proper legal conclusion from the assumed facts. The evidence does not show, that this money received by the guardian remained in his hands idle, because he was not able to lend it out safely. There is no proof, that he ever offered to lend this money to but a single person ; and he at first was inclined to borrow it, but afterwards declined to do so. There is proof, that during the war it was difficult to lend out money ; but nevertheless moneys were lent in that county during the war.

It is but fair to suppose, that this difficulty of lending money constantly increased, as the war progressed, both because of the increased circulation of money in the shape of Confederate notes, and because of their rapid decline in value as the war progressed. As early as February, 1862, when the last of this money was received, the circulation of Confederate notes was small as compared with what it afterwards became. And their depreciation then was but a trifle. It is therefore but reasonable to infer, that in February, 1862, the difficulty of lending money was far less than it was at a later period of the war, and that a reasonable effort, made by the

1878
Special Term.

McClure, Adm'r

v.
Johnson *et al.*

guardian then, would have enabled him to loan out this money.

It was incumbent on the guardian therefore to prove, that he made diligent effort to loan out this money and could not do so; and not having proved that he so acted, he ought to be presumed to have been content then to use this money, which was worth then nearly as much as gold, and to have the same charged to him. He has failed to prove even by himself, that he kept this money in kind on hand; and the fair presumption therefore is that he used it. And this presumption is strongly confirmed by his giving it in to commissioner Jones, before whom he made an *ex parte* settlement, as moneys with which he was chargeable, and contending then, not that he ought not to pay interest on it, but only that he ought not to pay compound interest upon it. That this was then his position is a fair inference from the report of commissioner Jones.

Had the guardian proven that he could not lend this money out after diligent effort, and that it remained in kind in his hands to the close of the war, it would still have been questionable whether he ought not to be charged with interest upon it, as it was a debt due from a perfectly solvent man and was bearing interest, and if it could not be loaned out by diligent effort, the propriety of the guardian receiving these bank notes in payment of such a debt is not apparent. He was under no obligation to receive these bank notes, and if the facts are as he claims, it would be very questionable whether he ought to have received them. But on the evidence the facts are not as claimed by him. These bank notes were worth then almost as much as gold, and in that early stage of the war I must presume could have been loaned out safely. As in point of fact they were not kept in kind, it is reasonable to suppose they were used by the guardian; and therefore he should pay interest on them.

It remains to consider the action of the circuit court in this case. From what has been said it is apparent,

Syllabus 1.

that the circuit court ought to have held the *ex parte*
settlement made by commissioner Jones as *prima facie* correct, but subject to be surcharged and falsified. Neither the bill, amended bill nor special replication surcharged any item of this *ex parte* settlement, nor the mode in which the account was stated. The answer of the defendant did not surcharge or falsify any item in this *ex parte* settlement. It is true, it insisted that the defendant as guardian ought not to be charged with interest on the amount received by him, as guardian, of Judy in bank notes, because the amount so received could not be loaned out and that he ought not to be charged with more than the value of these notes at the close of the war, if he should be charged with anything at all on that account, as he had invested the amount for his ward in a Confederate bond by the authority of Judge Allen. All of which positions would amount substantially perhaps to a surcharging of this *ex parte* settlement.

But the court itself undertook directly to act on the evidence bearing on the depositions of the defendant, directing the commissioner to return all the evidence to the court. And, as we have seen, this evidence did not sustain these positions, but did show the propriety of the *ex parte* settlement in charging the guardian with the whole amount collected by him of A. Judy and with the interest thereon from the time it was collected, and in not treating the Confederate bond as assets of the ward in the hands of the guardian. There was therefore no necessity for referring the guardian's account to a commissioner for settlement; but after the evidence had been taken the court ought to have decreed against the guardian and his sureties the amount found due from him by this *ex parte* settlement.

It is true we learn from the commissioner's, Blakemore's, report, that the plaintiff did, when the cause was before the commissioner, object to one, and only one, item in this *ex parte* settlement, that is, to the allowance of $60.00

to the guardian for an overcoat and cape furnished his ward, which objection was because of the supposed extravagant price paid for these articles; but this objection was sustained by no evidence; and had it been made in the bill, it could therefore not have been sustained. From the time when this overcoat and cape were purchased, 1864, it is fair to presume they were bought with Confederate notes; and if so, the charge of $60.00 for them would seem to be very reasonable and as the guardian as the administrator received rents and other moneys about the same time, amounting to over $100.00, it is fair to suppose he received them in Confederate notes; and he being indebted to his ward, it was proper that both these rents and overcoat and cape should be charged and credited with their full nominal amount without scaling them. See *Estill & Eakle* v. *McClintic's adm'r et al.*, 11 W. Va. 399.

The allowance of a commission to the guardian on the interest, with which he was charged in the *ex parte* settlement, would be apparently erroneous. But as the commission of a fiduciary is not fixed by law, but may be sometimes larger than the usual commission of five per cent, we cannot say that under the circumstaces, under which commissioner Jones allowed this excess of commission, it was an error. See *Estill & Eakle et al.* v. *McClintic's adm'r et al.*, 11 W. Va. 399. It was at best a mere trifle, the extra commission so allowed amounting to only about $6.00.

There is too an apparent error in this *ex parte* settlement in allowing any commissions to the guardian, as he did not, as required by law, settle his accounts within the time required by the statute. Ordinarily no extraneous testimony could be introduced showing the justice of allowing such commissions; but if such failure occurred during the war, such extraneous testimony ought to be received. For though the statute declares, that no commission under such circumstances shall be allowed, yet if there was no commissioner before whom

such settlement could be made, as may well have been during the war, it would be obviously in violation of the true spirit of this statute to enforce the forfeiture of the commission under such circumstances: the object of this statute being to impose this forfeiture for a default only of the fiduciary. If there were no courts open, before whom a suit could be brought, the statute of limitations, though equally express in its language, ceases to run. And for the same reason, if during the war there was no commissioner, this statute ought to cease in its operation. See *Estill & Eakle* v. *McClintic's adm'r*, 11 W. Va. 413. But it would be a sufficient reason in this case for allowing this commission, that it was allowed in the *ex parte* settlement of commissioner Jones, and this allowance was not surcharged and falsified by the plaintiff in his bill.

The various exceptions filed by the defendant, the guardian, to the two commissioners' reports, with the exception of those substantially made in his answer and which have been considered, have no application to the *ex parte* settlement of commissioner Jones with a single exception, that he was not allowed a commission on $607.27 of bonds for rent of ward's land passed over to the plaintiff December 13, 1866. It is a sufficient answer to this exception to say that not having settled his accounts after the war in the time required by law, he could not on that account alone be entitled to commission on the amount of these bonds.

It is obvious from what has been said, that the defendant, the guardian, cannot complain that any injustice was done him in any respect by the *ex parte* settlement made by Jones. And though perhaps in some respects it may be more favorable to the guardian than it might by evidence be shown was just, yet on its face it was not necessarily erroneous, and if there be any error in it prejudical to the plaintiff, such error must be very trifling; and as it was not surcharged or falsified by the plaintiff in his bill, he cannot complain of its being considered correct.

The court should therefore have affirmed this *ex parte* settlement of commissioner Jones, and decreed against the defendant in favor of the plaintiff the amount found due by it.   This as of the date of the final decree in this case, November 18, 1871, would be of principal $627.41 and of interest $353.75, or in all $981.16.   This differs from the amount decreed by the court against the defendant by the decree of September 17, 1870, by $32.84.   But as this last decree bore interest from its date, the error in the decree of September 17, 1870, against the defendant was $42.67.   But the court after it had rendered a final decree in this cause on September 17, 1870, did on November 18, 1871, without any bill of review or other proceedings proceed to open this decree, set it aside, and without being, as we have seen, justified even by the evidence arbitrarily reduced the amount of the decree against the defendants nearly $200.00.

The appellant's counsel insist, that the 10th section of chapter 131 of the Code of West Virginia, which provides when a judgment or decree is rendered for the payment of money, it shall be for the aggregate of the principal and interest due at the date of the judgment or decree, with interest thereon from date, violates the Constitution of the United States prohibiting any State to pass a law impairing the obligation of contracts, when applied to decrees on contracts made before the passage of the law, and that the decree in this case should not be entered.   This question has already been considered by this Court in the case of *Fleming* v. *Holt,* W. 12 Va. 143 ; and this act declared Constitutional.

Though the decree of the circuit court must be reversed, yet as the proper decree to be rendered is more favorable for the appellee than the decree of the circuit court appealed from, the appellee as the party substantially prevailing in this Court must recover his costs.

The decrees of the circuit court of November 18, 1871, must therefore be reversed and annulled, as well as all the other decrees rendered in this cause ; and the appel-

lee, John McClure, administrator of William M. McClure, must recover of the appellant, Jacob F. Johnson, his costs about his defense in this Court expended; and this Court proceeding to render such a decree as the court below ought to have done, doth adjudge, order and decree, that the plaintiff, John McClure, administrator of William M. McClure, deceased, do recover of the defendants, Jacob F. Johnson, John E. Wilson and Benjamin Hiner, nine hundred and eighty-one dollars and sixteen cents ($981.16), with interest thereon from the 18th day of November, 1871, till paid, and his costs about this suit expended in the circuit court, including an attorney's fee of $30.00.

*1878
Special Term.*

*McClure, Adm'r
v.
Johnson et al.*

THE OTHER JUDGES CONCURRED.

DECREES REVERSED.